GEORGE M. and JEAN H. JONES, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent JONES v. COMMISSIONER
Docket Nos. 2186-76, 4512-76, 5991-76, 5992-76, 5993-76, 5994-76, 4733-77, 4734-77, 4735-77, 4835-77, 5200-77.
United States Tax Court
T.C. Memo 1978-446; 1978 Tax Ct. Memo LEXIS 66; 37 T.C.M. (CCH) 1847-24; November 7, 1978, Filed *66 Claude R. Wilson, Jr., for the petitioners. James R. Turton, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in the Federal income tax of petitioners as follows: Docket
Taxable Petitioners
No.
Year
Deficiency
George M. and
Jean H. Jones
4735-77
1971
$ 2,998.78
2186-76
1972
4,412.63
4512-76
1973
20,863.29
4735-77
1974
23,279.59
1975
23,020.67
Charles M. and
Julia I. Wilson
5992-76
1973
$ 1,935.80
4835-77
1974
3,063.89
1975
3,336.42
Shields O. and
Harriette L. Livingston
5993-76
1973
$ 1,707.66
4734-77
1974
4,203.12
1975
3,561.60
Robert G. and
Francoise B. Long
5994-76
1973
$ 1,998.51
5200-77
1974
4,209.37
1975
3,353.50
Donald E. and
Carol J. McGuire
5991-76
1973
$ 1,982.80
4733-77
1974
4,209.87
1975
3,354.07
Uponmotion of the parties these cases were consolidated for purposes of trial, briefs, and opinion. The issue for our decision is whether a corporation, San Mateo Properties, Inc., or a limited partnership, San Mateo Properties, Ltd. II, is entitled to claim *67 income and expenses from the construction and operation of an apartment complex. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and supplemental stipulation of facts along with the attached exhibits are incorporated by this reference. Petitioner George M. Jones and his wife Jean H. Jones (hereinafter referred to as Dr. Jones) filed their joint Federal income tax returns for the taxable years 1971, 1972, 1973, 1974 and 1975 with the Internal Revenue Service Center at Austin, Texas. Petitioner Charles M. Wilson and his wife Julia I. Wilson filed their joint Federal income tax returns for the taxable years 1973, 1974 and 1975 with the Internal Revenue Service Center at Austin, Texas, as did petitioners Livingston, Long, and McGuire for their respective taxable years 1973, 1974 and 1975. At the time of filing their respective petitions all petitioners resided at Dallas, Texas. In 1969 petitioners formed a limited partnership, San Mateo Properties, Ltd. (hereinafter referred to as the partnership) for the purposes of developing and operating an apartment complex in the Dallas area. [2] Dr. Jones purchased tracts of land which he contributed *68 to the partnership. He became the general partner and as such received a 75 percent interest in the profits and losses of the partnership. The remaining petitioners contributed money and each received, as a limited partner, a 5 percent interest in the partnership's profits and losses. The partnership needed both permanent and interim financing to accomplish its purpose of developing an apartment complex. As a result Dr. Jones sought the necessary financing through various mortgage brokers who in turn attempted to locate a lending institution which was willing to negotiate a loan with San Mateo. In 1972, after changes in the architectural plans had been made, Dr. Jones contacted Texas Southwest Developers, Inc. (hereinafter Southwest) which secured permanent financing for the project by negotiating an agreement with First Mortgage Investors of Miami, Florida (hereinafter FMI). For their services Southwest received a fee in the amount of $13,500 from Dr. Jones. [3] The fee represented *69 1/2 percent of the total loan. FMI was willing to lend the partnership $2,700,000. As a result of further negotiations between the partnership and FMI, FMI agreed to lend only $2,350,000. Consequently, Dr. Jones negotiated a loan (a letter of credit) with Lakewood Bank and Trust for the additional amount of $350,000 needed for the project. Lakewood charged a fee in the amount of $3,500 for the letter of credit (1 percent of $350,000). During the negotiations with FMI and Lakewood Bank and Trust, the lending institutions informed Dr. Jones that they would be unable to consummate the loan agreements in the present form (i.e., an agreement with the partnership). Their reason for refusing to close the loan agreement with a partnership was based on the usury laws of Texas which limited interest rates on loans to individuals and partnerships. The lending institution agreed to make the loan only to a corporation.In response to this request, Dr. Jones and the limited partners of San Mateo formed in 1973 San Mateo Properties, Inc. (hereinafter referred to as the corporation). Upon the organization of the corporation, the limited partnership transferred by warranty deed certain real property *70 it held which had been contributed by Dr. Jones. The business purpose of the corporation, as stated in its Articles of Incorporation was "to plan, arrange, construct, manage, and operate residential properties, duplexes, apartment complexes and other tenements of every kind and character either alone or in partnership or joint venture with others." In addition, the corporation entered into a limited partnership agreement (hereinafter referred to as San Mateo II) with Dr. Jones and the limited partners of the partnership. This agreement provided for two general partners (Dr. Jones and the corporation) with the remaining partners of the partnership as limited partners.Dr. Jones and the limited partners were the sole shareholders of the corporation. [4]
*71 Following its organization the corporation entered into a loan agreement with FMI for the needed permanent financing whereby FMI agreed to lend $2,350,000 to the corporation and lend an additional amount of $350,000 when the apartments to be constructed reached 85 percent occupancy. The corporation then obtained a letter of credit from Lakewood Bank and Trust. [5]
After the corporation secured permanent financing it sought interim financing by contacting Texas State Mortgage, Inc., which negotiated an agreement with Texas Bank and Trust. During 1973 Texas Bank and Trust agreed to lend the corporation interim financing in the amount of $2,700,000. Dr. Jones, as president of the corporation, signed the loan agreement as guarantor. Expense fees in the amount of $49,063.08 were paid in 1973 to Texas Bank and Trust in order to obtain the interim financing. [6]
*72 The corporation then entered into a construction contract with Campbell Bros., Inc., which agreed to build an apartment complex on the property the partnership had contributed to the corporation. Under the contract the corporation agreed to pay Campbell Bros., Inc., approximately $2,700,000. As the construction progressed various alterations were made with respect to the design and size of the complex. These changes were made and agreed upon by both Campbell Bros. and the corporation, through its president Dr. Jones. The alterations of the complex were documented by "change orders" which reflected the corporation as owner of the complex. [7]
For the taxable years 1974 and 1975 the corporation made interest payments to Texas Bank and Trust pursuant to the interim financing loan agreement in the respective amounts of $165,532.13 and $81,730.13.The interest payments were made on a monthly basis as the interest costs were presented by Texas Bank and Trust to Dr. Jones in *73 his capacity as president of the corporation. Texas Bank and Trust lent additional amounts to satisfy the interest payments by depositing the appropriate amount each month in the corporation's account. Dr. Jones would then issue a corporate check payable to the bank in the amount of interest which was due that particular month. During 1974 Texas Bank and Trust informed Dr. Jones that FMI was no longer a viable enterprise and that it would be necessary for the corporation to obtain permanent financing from another lending institution. Dr. Jones sought the services of a mortgage broker, Robert L. Seigel and Associates, for the purpose of obtaining permanent funding to complete the construction of the apartment complex. While Seigel and Associates was unable to obtain the needed permanent financing, it was paid $1,500 in 1975 for its services. Texas Bank and Trust later was able to obtain the funds for the corporation. On its Federal Partnership Return of Income for the taxable year 1972 San Mateo II reported an ordinary loss in the amount of $14,666.10. A portion of this reported loss represented an "interest expense" in the amount of $13,500 which had been paid to Southwest. *74 The balance represented ad valorem taxes and miscellaneous deductions. Petitioners Jones claimed the entire amount ($14,666.10) on their joint Federal income tax return for the taxable year 1972, as their share of the partnership loss. On its Federal Partnership Return of Income for the taxable year 1973 San Mateo II reported an ordinary loss of $81,168.35 a portion of which represented "interest expenses" paid as follows: Texas State Mortgage, Inc.
$ 13,500.00
Texas Bank and Trust
49,063.08
Lakewood Bank and Trust
3,500.00
C. C. McLain
11,500.00
Dallas Title Co.
1,201.00
TOTAL
$ 78,764.08
In addition, the reported loss represented legal and accounting expenses in the amount of $2,047.30. Petitioners claimed the following distributive share of partnership losses for the taxable year 1973: Amount Petitioners
Claimed
Jones
$ 60,876.25
Wilson
4,058.00
Livingston
4,058.42
Long
4,058.42
McGuire
4,058.00
For the taxable year 1974 San Mateo II reported an ordinary loss of $168,395.17 a portion of which represented an interest payment to Texas Bank and Trust in the amount of $165,532.13. In addition, the reported loss represented *75 business expenses from the operation of the apartment complex in the amount of $14,380.99 and rental income from completed apartments in the amount of $11,517.95.
Petitioners claimed their distributive share of San Mateo II losses for the taxable year 1974 as follows: Amount Petitioners
Claimed
Jones
$ 126,296.37
Wilson
8,420.00
Livingston
8,419.76
Long
8,419.76
McGuire
8,419.76
Dr. Jones reported a net operating loss in the amount of $61,396.35 for the taxable year 1974. He then carried the loss back to the taxable years 1971 and 1972 and sought a refund based on the results of the carryback. In addition Dr. Jones included in the carryback an unused investment credit for the taxable year 1974 in the amount of $90.30. For the taxable year 1975 San Mateo II reported an ordinary loss in the amount of $134,162.90, a portion of which represented business expenses from the operation of the apartment complex in the amount of $132,772.83 and interest expenses paid to Texas Bank and Trust in the amount of $81,730.13. In addition, the reported ordinary loss included an offset of rental income from the operation of the apartment complex in the amount *76 of $80,340.06. Petitioners claimed as their distributive share of partnership losses for the taxable year 1975 as follows: Amount Petitioners
Claimed
Jones
$ 100,622.20
Wilson
8,420.00
Livingston
6,708.14
Long
6,708.00
McGuire
6,708.14
The Commissioner, in his statutory notices of deficiency, determined that San Mateo II was not entitled to deduct interest and business expenses for the taxable years in issue (1972, 1973, 1974, and 1975). The basis of the Commissioner's determination was that the apartment complex and the property on which it was built (to which the expenses related) was owned and operated by the corporation (San Mateo Properties, Inc.). The Commissioner further determined that the rental income from the operation of the apartment complex was not includible in the gross income of San Mateo II for the same reasons. Correspondingly, the Commissioner determined that petitioners were not entitled to deduct their pro rata shares of partnership losses which related to the interest and business expenses reported by San Mateo II. Therefore, the Commissioner increased petitioners' taxable income for their respective taxable years to the *77 extent of the interest and business expenses and decreased their taxable income to the extent of the rental income San Mateo II reflected in calculating its ordinary income for the taxable years 1974 and 1975. In addition, the Commissioner determined that because Dr. Jones did not have a net operating loss for the taxable year 1974 (due to the Commissioner's denial of Dr. Jones' reported pro rata share of partnership losses) he was not entitled to a net operating loss carryback to the taxable years 1971 and 1972.The investment credit carryback likewise was denied by the Commissioner. OPINION The issue for our decision is whether certain losses are deductible by the respective petitioners as their pro rata share of partnership losses for the taxable years in issue or whether the losses are those of the corporation and, thus, not deductible by petitioners. During the latter part of 1969 petitioners organized a limited partnership for the purpose of developing and operating an apartment complex. Dr. George Jones and his wife contributed property while the remaining petitioners contributed money. Following the organization of the partnership various architectural changes were *78 made with respect to the design of the apartment complex. In 1972 Dr. Jones, in his capacity as general partner, sought financing with respect to the construction of the apartments. Due to the nature of the partnership's activities it was necessary to obtain permanent as well as interim financing. In both instances, various lending institutions informed Dr. Jones that they would be unable to lend the needed money to a partnership due to the usury laws of Texas. As a result, petitioners organized the corporation under the laws of the State of Texas for the purpose of obtaining the necessary financing of the apartment project and the construction and operation of the apartment complex. Petitioners transferred by warranty deed the property which had been held under the limited partnership and in return received stock in the newly organized corporation. The corporation then obtained the financing to begin construction of the apartments. In addition, Dr. Jones, in his capacity as director and president of the corporation entered into a construction contract with Campbell Bros., Inc., for the purpose of constructing the desired apartments. During the course of construction various changes *79 in design were made. On each occasion Campbell Bros., Inc., and Dr. Jones, as president of the corporation, agreed on the design changes. As portions of the apartment were completed, individual units were rented by San Mateo II and all rental fees were deposited into its bank account. For the taxable years 1972 through 1975 San Mateo II calculated its ordinary income by including the rental income from the apartments and deducting interest expense which related to the construction and operation of the apartment complex. As a result of this San Mateo II reported a loss for each such taxable year. Correspondingly, the petitioners deducted their shares of its losses. Respondent takes the position that none of petitioners is entitled to a partnership loss deduction for the taxable years 1972, 1973, 1974, and 1975 because the corporation is entitled to claim the income and expenses from the construction and operation of the apartment complex. In substance respondent argues that the corporation should be recognized as a separate taxable entity and as such is entitled to deductions for the business and interest expenses paid for the financing, construction and operation of the apartment *80 complex. Generally, a corporate entity will not be ignored, except in unusual circumstances. . The principal exceptions are when the corporation is a sham and when the corporatio has been created for the purpose of tax avoidance. In , the Supreme Court set forth criteria for recognition or nonrecognition of a corporate entity by stating: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Footnotes omitted.] [.] Therefore Moline established a two-prong test, the first part being business purpose and the second part business activity. , *81 affd. . Business purpose and business activity are alternative requirements. . Clearly th5 "business purpose" test is present in the facts of the instant case. Petitioners formed the corporation for the purpose of obtaining the necessary financing to construct the apartment complex. Due to the usury laws of Texas, lending institutions would not finance the project by lending the necessary funds to individuals or partnerships. The organization of the corporation enabled petitioners to accomplish what they could not do as individuals or partners. We have previously held that the avoidance of restrictions under state law constitutes a valid business purpose which requires the recognition of the corporate entity. , affd. , an unreported opinion, USTC para 9340; . In addition, the Fifth Circuit Court of Appeals recognized a valid business purpose where taxpayers incorporated to avoid *82 state usury laws. In Collins, the Court stated: I do not perceive how plaintiffs can maintain that Bencap, Inc. was only a fictive creature (a dummy or straw corporation) to be ignored when it came to the tax advantages of the individuals arising out of a business venture that would not have fructified without the use of the corporate device in connection with the temporary financing of the project. * * * [.] Moreover, the corporation negotiated a construction contract with Campbell Bros., Inc. and on numerous occasions changed the design and size of the complex. While its business activities were not extensive, they were sufficient to enable it to carry out the purpose for which it was created. Petitioners take the position that the corporation was a "viable" corporation during the taxable years in issue. However, petitioners argue that for purposes of obtaining the loan and entering into the construction contracts, the corporation acted as the agent of the limited partnership. Therefore, the corporation acted as a mere conduit. The Supreme Court dealt with a similar argument in *83 Moline where it stated: the mere fact of the existence of a corporation with one or several stockholders, regardless of the corporation's business activities, does not make the corporation the agent of its stockholders. * * * [
The Supreme Court again stated its position in . In National Carbide the Court stated that if a corporation is a true agent, its relationship with its principal must not be dependent upon the fact that it is owned by the principal. . Therefore, in order for petitioners to prevail, they must demonstrate the existence of the normal incidents of an agency relationship between the limited partnership and the corporation under the tests of Moline and National Carbide.Petitioners have failed to meet their burden of proof because the existence of the corporation was totally dependent upon the fact that it was owned and controlled by petitioners. Moreover, the fact that the corporation was a partner with petitioners does not negate petitioners' total dominance of the corporation. . *84 Petitioners chose the advantages of doing business in the corporate form and correspondingly they must accept the tax disadvantages. ;. Accordingly, San Mateo II is not entitled to deduct the interest and business expenses which related to the construction and operation of the apartment complex. As a result, petitioners are not entitled to deduct their pro rata share of San Mateo II losses which relate to such expenses for the taxable years in issue.Having found for respondent we need not address ourselves to his alternative arguments relating to this issue. Respondent further argues that the mortgage fees, loan fees, legal fees, and title policy fees incurred to obtain the loans for the construction of the apartment complex are not deductible but must be amortized over the life of the loans.This argument appears for the first time in respondent's opening brief. Neither the statutory notices of deficiency, nor respondent's pleadings raise this argument as an issue in the instant case. Moreover, respondent in his opening argument at trial, took the *85 position that the issue for our decision related to whether the corporation or the limited partnership was entitled to deduct certain interest and business expenses and in the alternative whether petitioners could deduct interest expenses on a loan when the funds used to pay the interest were borrowed from the same lending institution. With respect to respondent's alternative argument, this Court ruled that respondent had assumed the burden of proof and allowed him to amend his pleadings accordingly. This he did. However, for reasons known only to respondent, he declined to plead facts relating to the question of deductibility versus amortization. Therefore, we decline to speak to this alternative argument of respondent. Cf. ; ; ; . We, therefore, sustain respondent's determination as stated in his statutory notices of deficiency.
Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Donald E. and Carol J. McGuire, docket No. 5991-76 and 4733-77; Charles M. and Julia I. Wilson, docket No. 5992-76 and 4835-77; Shields O. and Harriette L. Livingston, docket No. 5993-76 and 4734-77; and Robert G. and Francoise B. Long, docket No. 5994-76 and 5200-77.↩
2. Petitioners Livingston and McGuire became limited partners of San Mateo Properties, Ltd., for the first time during the taxable year 1973. An additional limited partner is not before this Court.↩
3. In addition, during 1973 a brokerage fee was paid to C. C. McLain for the purpose of locating permanent financing. ↩
4. Dr. Jones received a 75 percent interest in the losses of San Mateo II and the remaining petitioners, as limited partners received a 5 percent interest in their share of the losses. The corporation was not entitled to a distributive share of losses but San Mateo II agreed to compensate the corporation for its services 30 percent of the future net profits of the partnership. The record does not reflect that the corporation received any "compensation" during the taxable years in issue.↩
5. In 1973 legal fees in the amount of $276.10 were paid to a law firm for preparing the necessary documents to obtain the letter of credit.↩
6. During 1973 Dr. Jones paid Dallas Title Company $1,201 for the purpose of documenting clear title to the property on which the apartments were built. Texas Bank and Trust required this documentation pursuant to the interim financing agreement with the corporation. In addition, the corporation paid an attorney for services rendered in preparing the necessary legal documents related to the loan from Texas Bank and Trust.↩
7. As individual apartments were completed San Mateo II entered into lease agreements with prospective tenants. The rental proceeds flowing from such leases were deposited in an account of San Mateo II.↩